**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| | ) | CASE NO. 16-20960 (JJT) |
| WALNUT HILL, INC., | ) | |
| | ) | |
| DEBTOR. | ) | |
| _____ | ) | |
| BONNIE C. MANGAN, Chapter 7 Trustee for | ) | |
| WALNUT HILL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. _____ |
| | ) | |
| TL MANAGEMENT, LLC, CT FINANCE 1, | ) | |
| LLC, PARKSIDE REHABILITATION AND | ) | |
| HEALTHCARE CENTER, LLC, GRAND | ) | |
| STREET NURSING, LLC, GRAND STREET | ) | |
| REAL ESTATE, LLC, GRAND STREET PL, | ) | |
| LLC, TUNIC CAPITAL, LLC, TEDDY | ) | |
| LICHTSCHEIN, ELIEZER SCHEINER, and | ) | |
| ANNEMARIE GRIGGS | ) | |
| | ) | |
| Defendants. | | |

**COMPLAINT**

Bonnie Mangan, Chapter 7 Trustee (the "Trustee") of Walnut Hill, Inc. ("Walnut Hill" or the "Debtor"), in support of this complaint ("Complaint"), hereby alleges:

**PRELIMINARY STATEMENT**

This is an action brought by the Trustee to, *inter alia*, recover certain preferential transfers of the Debtor's property and to avoid a series of collapsible transactions that resulted in the Debtor transferring all of its assets for no consideration, while: (a) the Debtor retained all of its liabilities; (b) the Debtor's former principal received $175,000.00 for causing the Debtor to

enter into the transactions; and (c) insiders of the Debtor received releases of their multimillion-dollar obligations concerning loan guarantees.

<u>**JURISDICTION, VENUE AND NATURE OF THIS PROCEEDING**</u>

1.      On June 14, 2016, the Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code.  The Trustee was appointed Chapter 7 Trustee of the Debtor.

2.      This Complaint initiates an adversary proceeding pursuant to §§ 105, 502(d), 510, 544, 546, 547, 548, 550 and 551 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Fed. R. Bankr. P. 7001(1).  The Complaint seeks: (1) to avoid and recover for the benefit of the Debtor's estate preferential transfers of the Debtor's property made to or for the benefit of the defendants, on or within ninety (90) days of the Petition Date; (2) to avoid and recover intentional and constructive fraudulent transfers of the Debtor's property made to or for the benefit of the defendants; (3) to disallow all claims of the defendants against the Debtor and the estate; (4) to subordinate any allowed claims of the defendants against the Debtor and the estate to the claims of all other creditors of the estate; (5) an injunction against the defendants prohibiting them from further transferring or disposing of any of the property transferred; and (6) other legal and equitable relief.

3.      This Court has jurisdiction, under 28 U.S.C. §§ 157 and 1334(b), of the subject matter of this proceeding because the claims asserted herein arise under Chapter 7 of the Bankruptcy Code and are related to a case pending under the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut, Hartford Division (the "Bankruptcy Court").

4.      This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (E), (F), (H) and (O).

2

5.      Pursuant to 28 U.S.C. § 1409(a), venue of this adversary proceeding in the

Bankruptcy Court is proper because the Debtor's case is pending in this district and division.

## PARTIES

6.      The Trustee is the duly appointed Chapter 7 Trustee in this Chapter 7 case.

7.      Defendant, TL Management, LLC ("TL Management"), is a Florida limited

liability company with a place of business in Brooklyn, N.Y.

8.      Defendant, CT Finance 1, LLC ("CT Finance") is a Delaware limited liability

corporation with a place of business in Brooklyn, N.Y.

9.      Defendant, Grand Street Nursing, LLC ("Grand Street Nursing"), is a Delaware

limited liability company with a place of business in Brooklyn, N.Y.

10.     Defendant, Grand Street Real Estate, LLC ("Grand Street Real Estate"), is a

Connecticut limited liability company with a place of business in Brooklyn, N.Y.

11.     Defendant, Grand Street PL, LLC ("Grand Street PL"), is a Connecticut limited

liability company with a place of business in Brooklyn, N.Y.

12.     Defendant, Tunic Capital, LLC ("Tunic Capital"), is a New York limited liability

company with a place of business in Brooklyn, N.Y.

13.     Defendant, Teddy Lichtschein ("Lichtschein"), is an individual residing in Spring

Valley, NY, with a place of business in Brooklyn, N.Y.

14.     Defendant, Eliezer Scheiner ("Scheiner"), is an individual residing in Suffern,

NY, with a place of business in Brooklyn, N.Y.

15.     Upon information and belief, Lichtschein and Scheiner are the owners of, and the

individuals who control the activities of, TL Management, CT Finance, Tunic Capital, Grand

Street Nursing, Grand Street Real Estate and Grand Street PL.

3

16.     Defendant, Parkside Rehabilitation and Healthcare Center, LLC ("Parkside"), is a Connecticut limited liability company with a place of business at 55 Grand Street, New Britain, CT.

17.     Defendant, Annemarie Griggs ("Ms. Griggs"), is an individual with a residence in Beverly Hills, CA.

## FACTS COMMON TO ALL COUNTS

### I.      Background Information

18.     The Debtor was a corporation that operated a skilled nursing/chronic and convalescent nursing home facility located at 48 Grand Street, New Britain, CT and 55 Grand Street, New Britain, Connecticut (collectively, the "Premises").

19.     Non-party, Walnut Hill Holdings, LLC ("WH Holdings") was a Connecticut limited liability company with a place of business located at the Premises and was the owner of the Debtor.

20.     Non-party, Walnut Hill Real Estate, LLC ("WH Real Estate"), was a Connecticut limited liability company with a place of business at the Premises.

21.     WH Real Estate was the owner of the Premises until the Premises was transferred to Grand Street Real Estate in February 2015.

22.     WH Real Estate was owned by WH Holdings.

23.     The Debtor was the owner of property known as 39 Grand Street, New Britain, Connecticut and 45 Grand Street, New Britain, Connecticut (collectively, the "Parking Lot"), which was a parking lot used in furtherance of the Debtor's business, until the Debtor transferred it to Grand Street PL.

4

24. For years, the Debtor was owned by WH Holdings, LLC and was operated by Dr. Donald Griggs ("Dr. Griggs").

25. Upon information and belief, Helen Karlonas ("Ms. Karlonas") was the sister of Dr. Griggs.

26. Upon information and belief, by November 2012, at the latest, Dr. Griggs's mental capacities were diminished, and he was showing signs of dementia.

27. Dr. Griggs was later adjudged to be incompetent and his daughter, Annemarie Griggs ("Ms. Griggs") was appointed his conservator on November 5, 2014.

## II. The TD Bank Debt

28. In 2008, the Debtor, along with various insiders, entered into a series of financing transactions with T.D. Bank, N.A. ("TD Bank"), evidenced by the following loan documents:

    a.    A secured promissory note dated December 29, 2008, executed by the Debtor and WH Real Estate in favor of TD Bank in the principal sum of $8,500,000.00 (the "$8.5 Million Note");

    b.    An Open-End Mortgage Deed and Security Agreement (the "Mortgage") dated December 29, 2008, concerning the Premises, executed by WH Real Estate to secure the $8.5 Million Note;

    c.    An Assignment of Leases and Rents, dated December 29, 2008, granted by WH Real Estate to TD Bank to further secure the $8.5 Million Note;

    d.    A UCC-1 Financing Statement dated December 29, 2008 was granted by WH Real Estate to TD Bank to further secure the $8.5 Million Note;

    e.    A Revolving Credit Note (the "Revolving Credit Note"), in the face amount of $500,000.00, executed by the Debtor and WH Real Estate;

    f.    A Limited Guaranty Agreement, dated December 29, 2008, executed by Dr. Griggs, securing the $8.5 Million Note;

    g.    A Limited Guaranty Agreement, dated December 29, 2008, executed by Dr. Griggs, securing the Revolving Credit Note;

    h.    A Limited Guaranty Agreement, dated December 29, 2008, executed by Ms. Karlonas, securing the Revolving Credit Note;

      i.      An Unlimited Guaranty Agreement, dated December 29, 2008, executed by WH Holdings, securing the $8.5 Million Note;

      j.      An Unlimited Guaranty Agreement, dated December 29, 2008, executed by WH Holdings, securing the Revolving Credit Note;

      k.      A Loan and Security Agreement, dated December 29, 2008, executed by the Debtor and WH Real Estate; and

      l.      A Commercial Loan Agreement, dated December 29, 2008 among TD Bank, the Debtor, WH Real Estate, WH Holdings, Dr. Griggs and Ms. Karlonas.

(collectively, the "Loan Documents").

**III.    The Debtor's Principal Required Assistance to Operate the Debtor's Business.**

29.    In or about the summer of 2012, a temporary administrator, Rosemarie Clark ("Clark"), was installed at the Debtor to supervise the Debtor's operations pursuant to a consent order issued on August 21, 2012 by the State of Connecticut.

30.    On or about January 7, 2013, Walnut Hill Management Co. LLC ("WHMC"), owned and operated by Richard (a/k/a Aryeh) Platschek assumed management of the Debtor.

31.    By way of a letter dated January 24, 2014, the Debtor terminated WHMC as manager of the Debtor.

32.    On August 21, 2014, TD Bank commenced an action to enforce its rights under the Loan Documents against, *inter alia,* the Debtor, WHMC, WH Real Estate, WH Holdings and Dr. Griggs in the Connecticut Superior Court, Case No. HHB-CV14-6026483 (the "Foreclosure Action").

33.    Because the Debtor was a skilled nursing facility with numerous residents, and other issues existed concerning the transfers of ownership and/or management of a skilled nursing facility, WHMC continued to manage the Debtor's operations until approximately February 2015.

IV.     **Scheiner and Lichtschein Orchestrated a Scheme to Denude the Debtor of Its Assets.**

34.     Beginning in January 2015, Scheiner, Lichtschein, TL Management, and/or CT Finance (the "Conspirators") initiated a series of collapsible transactions pursuant to which: (a) the Debtor transferred all of its assets for no consideration; (b) the Debtor retained all of its liabilities; (c) WH Real Estate transferred ownership of the Premises, which housed the Debtor's operations; (d) Ms. Griggs received $175,000.00; and (e) various insiders of the Debtor received releases of multimillion-dollar obligations under the Loan Documents.

35.     In order to effectuate this scheme, Scheiner, Lichtschein and/or TL Management formed various limited liability companies to take ownership and control of the TD Debt, the assets of the Debtor, and the property owned by WH Real Estate.

36.     On or about January 20, 2015, Scheiner, Lichtschein and/or TL Management formed CT Finance.

37.     By way of an *Assignment of Loan Documents* dated February 6, 2015, TD Bank transferred and assigned all of its rights, title and interest in the Loan Documents to CT Finance.

38.     CT Finance, by and through Scheiner and Lichtschein, purchased the Loan Documents in order to gain leverage to initiate the series of transactions set forth below and deprive the Debtor of all of its assets.

39.     As the holder of the Loan Documents, CT Finance, by and through Scheiner and Lichtschein, was now in a position to orchestrate the transfers outlined below by, *inter alia*, offering to provide releases to various insiders of the Debtor, in exchange for which the Debtor, acting by and through Ms. Griggs, transferred all of its assets for no consideration to entities owned and controlled by Scheiner and Lichtschein.

40.     On February 12, 2015, after CT Finance owned the Loan Documents, controlled the Foreclosure Action, and was in a position to exercise the rights of TD Bank as a secured lender, Scheiner, Lichtschein and/or TL Management formed Grand Street Nursing for the purpose of acquiring the Debtor's assets and taking over the Debtor's operations.

41.     On February 13, 2015, Scheiner, Lichtschein and/or TL Management formed Grand Street PL for the purpose of acquiring the Parking Lot, which was owned by the Debtor.

42.     On February 13, 2015, Scheiner, Lichtschein and/or TL Management formed Grand Street Real Estate for the purpose of acquiring the Premises from WH Real Estate.

**a)  The Conspirators Compensated the Debtor's Principal to Induce Her to Surrender the Debtor's Tangible Assets for No Consideration to the Debtor.**

43.     On or about February 15, 2015, the Debtor, WH Real Estate and Grand Street Real Estate entered into a *Real Property Purchase Agreement* (the "Premises Purchase Agreement"), pursuant to which WH Real Estate agreed to transfer the Premises to Grand Street Real Estate.

44.     Pursuant to the Premises Purchase Agreement, Grand Street Real Estate agreed to assume the obligations of WH Real Estate under the Loan Documents – which were now held by Grand Street Real Estate's affiliate, CT Finance.

45.     A condition precedent to the Debtor's and WH Real Estate's obligations under the Premises Purchase Agreement was that Dr. Griggs and the Estate of Ms. Karlonas (collectively, the "Guarantors"), shall have entered into a conditional release agreement with CT Finance, which defined the conditions under which the Guarantors would be released of their obligations as guarantors of the indebtedness evidenced by the Loan Documents.

46.     The Debtor's obligations under the Loan Documents, however, were expressly *not* assumed by Grand Street Real Estate under the Premises Purchase Agreement.

8

47.     Pursuant to the Premises Purchase Agreement, the Debtor agreed to transfer to Grand Street Real Estate, or one of its affiliates, all of the "assets, operating equipment, machinery, fixtures, furniture, office equipment . . . and personal property of every kind and description owned by [the Debtor], used in the business and operation of the Facility or the Facility Business."

48.     Pursuant to the Premises Purchase Agreement, the Debtor agreed to (a) the termination of its lease to operate its skilled nursing facility at the Premises; (b) stipulated to waive service of a notice to quit the Premises; (c) stipulated that it had no defense to a summary process action; and (d) agreed to the immediate entry of judgment in a summary process action, with a stay of execution until March 31, 2016, provided that the Debtor paid use and occupancy to Grand Street Real Estate in the amount of $90,000.00 per month.

49.     By way of Warranty Deed dated February 12, 2015 (the "Premises Deed"), WH Real Estate conveyed the Premises to Grand Street Real Estate.

50.     The Premises Deed was recorded on March 19, 2015.

51.     The Premises Deed specifically stated that Grand Street Real Estate assumed and agreed to pay taxes owing to the City of New Britain as part of the consideration for the Premises Deed.

52.     In fact, the Debtor paid taxes on the Premises between August 2015 and December 2015 after the Premises was conveyed to Grand Street Real Estate.

**b)  The Debtor Transferred Its Real Property for No Consideration.**

53.     By way of a *Real Estate Purchase and Sale Agreement* dated March 2, 2015 (the "Parking Lot Agreement"), the Debtor and Grand St. PL entered into an agreement whereby the Parking Lot was to be transferred to Grand Street PL.

54.    The Parking Lot Agreement provided that Grand Street PL was to assume unpaid property taxes on the Parking Lot, pay state and local conveyance taxes associated with the sale, and take title to the property subject to an attachment in favor of its affiliated entity, CT Finance (although the Parking Lot Agreement referred to an attachment in favor TD Bank, not CT Finance).

55.    By way of Warranty Deed dated February 12, 2015 (the "Parking Lot Deed"), the Debtor conveyed the Parking Lot to Grand Street PL.

56.    The Parking Lot Deed was recorded on March 19, 2015.

57.    The Parking Lot Deed specifically stated that Grand Street PL assumed and agreed to pay taxes owing to the City of New Britain as part of the consideration for the Parking Lot Deed.

58.    In fact, the Debtor paid taxes on the Parking Lot between August 2015 and December 2015 after the Parking Lot was conveyed to Grand Street PL.

**c)    The Debtor Transferred Its Operations and Assets for No Consideration.**

59.    By virtue of an *Operations Transfer and Surrender Agreement* (the "OTA"), dated February 2015, executed by the Debtor, as transferor, and Grand Street Nursing, as transferee, the parties entered into an agreement pursuant to which Grand Street Nursing would acquire virtually all of the Debtor's assets, and none of the Debtor's liabilities, as of an anticipated closing date defined in the OTA.

60.    Section 2.1 of the OTA provides that Grand Street Nursing was to acquire virtually all of the Debtor's assets, including, *inter alia*:

> (a)    all furniture, fixtures, furnishings, equipment, appliances, tools, instruments, machinery, computers, computer equipment and hardware, office equipment, trucks, vehicles and other transportation equipment, parts, supplies and other intangible personal property owned by [the

10

Debtor] as of the date of this OTA or acquired by [the Debtor] prior to the Closing Date which are used in connection with the operation of the Facility;

(b)     all inventory and supplies…including, but not limited to, office, foodstuffs, medical, disposables, prescription medications and pharmaceutical inventories and supplies …

(c)     all contracts, agreements, leases purchase orders (collectively "Contracts"), insurance policies and other arrangements, whether oral or written, to the extent transferable and to the extent expressly assumed in writing by [Grand Street Nursing] in its sole discretion, excluding, however, rights, claims or responsibilities thereunder existing and relating to the period of time prior to the Closing Date.  by [Grand Street Nursing] will inform [the Debtor] in writing of the Contracts set forth on Exhibit 2.1(c), which it intends to assume ("Assumed Contracts") by delivering to Transferor a listing of the Assumed Contracts….

(d)     all administrative records, financial books and records, employee and payroll records, including, but not limited to, all books, records, files, computer software, data or databases, correspondence, memoranda, notes and other documents or papers and other evidence thereof relating to the operation of the Facility ("Books and Records"). …

(e)     all patient medical records, medical staff records, and medical/administrative libraries;

(f)     copies of all other books and records of or relating to the Facility;

(g)     licenses, certificates, permits, waiver, consents, authorizations, variances, approvals, accreditations, guaranties, certificates of occupancy, utility lease agreements, covenants, commitments, certificates, warrants, deposits and reserves relating to the Facility and the Transferred Assets, if any, issued to or on behalf of [the Debtor] relating to the Transferred Assets or the Facility, provided same are transferable and assumed by [Grand Street Nursing] (the "Permits");

(h)     [The Debtor's] rights in and to its provider number and provider and reimbursement agreement under the Medicare Program and any other third party payor programs provided the same are transferable;

(i)     all accounts receivable and other rights to payments from third parties, including, without limitation, residents of the Facility, all other accounts or notes receivable of the [the Debtor] relating to the Facility and any claim, remedy or other right related to any of the foregoing, including, without limitation, resident accounts and Medicaid and Medicare accounts

receivable to the extend the foregoing arise from and/or relate to the period of time prior to the Closing Date, funds from all rate adjustments and appeals (and receivables with respect thereto) relating to dates of service prior to the Closing Date; and

(j)     all other assets, properties, rights, business and intangible personal property of every kind and nature owned by [the Debtor] on the Closing Date, known or unknown, fixed or unfixed, choate or inchoate, accrued, absolute, contingent or otherwise, whether or not specifically referred to in this OTA relating to the Facility to the extent not expressly excluded pursuant to Article 2.8.

61.    The OTA fails to recite any consideration to the Debtor in exchange for the transfer of the aforementioned assets of the Debtor and, upon information and belief, the Debtor received no consideration from Grand Street Nursing or any other person or entity for the transfers listed in the OTA.

62.    Upon information and belief, Exhibit 2.1(c) to the OTA, which was to contain a list of contracts Grand Street Nursing had the option to assume from the Debtor, was never provided to the Debtor.

63.    Per Section 2.4(a) of the OTA, Grand Street Nursing was to assume all obligations and liabilities under the Assumed Contracts (as defined in the OTA) to the extent such obligations and liabilities had accrued and related to the period after the closing, and the Debtor's rights in the Assumed Contracts had been assigned to and received by Grand Street Nursing.

64.    Upon information and belief, Grand Street Nursing and/or Parkside never delivered a list of Assumed Contracts to the Debtor.

65.    Section 2.4(b) of the OTA further limited Grand Street Nursing's assumption of any liabilities, as follows:

(b)     Except for the Assumed Liabilities, [the Debtor] shall retain all of its liabilities and obligations of any kind or nature, at any time existing or

12

asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of or by reason of the ownership or operation of the Assets, the Facility and/or the business prior to the Closing Date.  Except to the extent expressly and unambiguously expressed herein to the contrary, [Grand Street Nursing] is not the successor to liability of [the Debtor] and is not herein assuming any liability or detriment from, arising from, out of, or relating to, [the Debtor's] ownership of the Assets, the Facility or any activity of [the Debtor] prior to the Closing Date or conduct of [the Debtor] after the Closing Date.  [Grand Street Nursing] does not and shall not assume any payable of [the Debtor], governmental claim or charge, liability of any governmental claim or charge, liability for any general liability, malpractice, professional liability, Law, equity, in tort, contract, from statute, common law, or from any other source or precedent.

[The Debtor] shall retain all of the foregoing liabilities and obligations (the "Retained Liabilities").  Without limiting the generality of the foregoing, [the Debtor] shall retain and [Grand Street Nursing] shall not assume,

> (i) any Medicaid and/or Medicare liabilities for the period prior to the Closing, al of which [the Debtor] agrees to satisfy in full as and when due;

> (ii) accrued expenses which were incurred in the ordinary course of business of the Facility;

> (iii) Liens affecting the Transferred Assets other than Permitted Encumbrances;

> (iv) any liability or obligation of [the Debtor] arising out of or based upon [the Debtor's] ownership and operation of the Facility prior to the Closing;

> (v) any losses or liabilities resulting from any … audits as well as any investigation from a governmental entity, quasi governmental entity, or an entity acting with authority of the foregoing by a whistleblower or other private citizen claiming a violation of a healthcare related statute or a violation of the Medicare or Medicaid or other third party provider agreement relating to or arising from the period of operation prior to the Closing Date; and/or

> (vi) any liability or obligation of [the Debtor] arising out of or based upon [the Debtor's] ownership and operation of the Excluded Assets.

13

66.     Because Grand Street Nursing never provided the Debtor with a list of Assumed Contracts, it does not appear that any of the Debtor's contractual liabilities were assumed pursuant to the OTA.

67.     Indeed, even if certain contracts had been assumed pursuant to the OTA, any liabilities arising thereunder were limited to those liabilities that accrued after the closing date.

68.     By way of an undated document entitled, "Bill of Sale," purportedly for "the sum of $10.00 and other good and valuable consideration," the Debtor sold and transferred "[a]ll personal property of every kind and description whatsoever, including without limitation all equipment, machinery, apparatus, appliances, inventory, furniture and fixtures" to Grand Street Real Estate.

### d)  CT Finance Releases Insiders of The Debtor in Exchange for The Debtor's Assets.

69.     In February 2015, CT Finance entered into a *Conditional Release Agreement* (the "Conditional Release Agreement") with the Debtor, WH Real Estate, WH Holdings, Dr. Griggs (with Ms. Griggs signing as the conservator of his person and estate), and the Estate of Ms. Karlonas (with Ms. Griggs signing on behalf Ms. Karlonas' estate, in her then anticipated capacity as the administratrix of said estate).

70.     The Conditional Release Agreement specifically tethered the conditional releases provided thereunder to the cooperation of the Debtor, WH Real Estate, WH Holdings and the Guarantors (collectively, the "Obligors") in effectuating the transfers that stripped the Debtor of its assets.

71.     More particularly, the Conditional Release provided:

.... Obligors have offered as substituted performance of their obligations under the Loan Documents their full cooperation in the transfer of the Walnut Hill

14

Operating Assets to persons or entities acceptable to Lender and have requested that Lender release Guarantors from their obligations under the Loan Documents on the condition and understanding that such obligations of the Guarantors shall be fully reinstated and enforceable in the events that (i) Obligors shall not have taken all reasonable actions to vest title to the Walnut Hill Operating Assets in persons or entities acceptable to Lender,[1] (ii) Lender has moved for the foreclosure of the mortgage and because of a failure of cooperation of the Obligors the foreclosure of the Mortgage, has not resulted in a final and unappealable judgment vesting title to all the Walnut Hill Operating Assets in Lender or persons or entities acceptable to Lender, (iii) Obligors refused or failed to assist and cooperate with Lenders in any proceeding under Title 11 of the United States Code ("Bankruptcy Proceeding"), as a result of which failure to assist or cooperate, title to all the Walnut Hill Operating Assets have not passed to Lender or persons or entities acceptable to Lender or (iv) WHI fails or refuses to vacate the premises and cooperate in the transition of operations to Lender's designee.  Lender is willing to grant Guarantors' request for a present release subject to reinstatement as aforesaid, provided that the Obligors cooperate with Lender in the orderly transfer of the Walnut Hill Operating Assets or, if necessary in Lender's sole judgment, foreclosure of the Mortgage, or through a Bankruptcy Proceeding, and provided that Obligors do not commit any Guaranty Springing Reinstatement Events as defined and enumerated herein.  The parties have entered into this Agreement to evidence their agreement regarding the foregoing matters.

72.     Pursuant to the Conditional Release Agreement, CT Finance released only the Guarantors, not the Debtor or WH Real Estate, from their obligations under the $8.5 Million Note and the Revolving Credit Note.

73.     Upon information and belief, Ms. Griggs and/or her family were beneficiaries of both the Estate of Donald Griggs and the Estate of Ms. Karlonas and, therefore, benefitted from the Debtor surrendering its assets in order to obtain a release of the Guarantors.

   **e) Ms. Griggs Benefitted Directly from The Transactions That Denuded the Debtor of Its Assets.**

74.     In February 2015, Grand Street Nursing and Ms. Griggs entered into a *Consulting Agreement* (the "Consulting Agreement"), pursuant to which Ms. Griggs was ostensibly to serve

---

[1] *See* Section 3 of the Consulting Agreement between Grant Street Nursing LLC and Annemarie Griggs for delineation of "reasonable efforts."

15

in the capacity of an on-call management consultant to Grand Street Nursing to assist with the transition in ownership and operation of the business from the Debtor to Grand Street Nursing.

75. Per the Consulting Agreement, Ms. Griggs was to be compensated in the amount of $175,000.00 (the "Consulting Fee").

76. Pursuant to the Consulting Agreement, Ms. Griggs was to receive the Consulting Fee in two (2) installments, both of which were specifically tied to milestones in the transfer of the Debtor's assets to Grand Street Nursing or its assignee.

77. The first installment paid to Ms. Griggs pursuant to the Consulting Agreement, which was in the amount of $75,000.00, was due upon: (a) execution of the OTA; (b) execution of the Premises Purchase Agreement; (c) execution of the Parking Lot Agreement; (d) delivery of the Premises Deed and Parking Lot Deed (together with the required conveyance tax forms); (e) a Bill of Sale from the Debtor to Grand Street Real Estate for the personal property being transferred by the Debtor to Grand Street Real Estate; and (f) a Stipulation to Entry of Judgment of Summary Process by the Debtor as "Defendant" in favor of Grand Street Real Estate, as "Plaintiff."

78. The second installment to be paid to Ms. Griggs pursuant to the Consulting Agreement was due and payable upon the earlier of the transition of the Debtor's facility to Grand Street Nursing or March 1, 2016.

79. Upon information and belief, Ms. Griggs was paid $75,000.00 upon the execution of the OTA and the delivery of documents referenced above, all of which were necessary to effectuate the transactions that resulted in the transfer of all of the Debtor's assets for no consideration.

16

80.      Sometime after her counsel sent a demand to Grand Street Nursing on April 5, 2016, Ms. Griggs received the second installment of the Consulting Fee, which was $100,000.00.

81.      Upon information and belief, in furtherance of the Scheiner and Lichtschein scheme, Tunic Capital initially provided the funds to pay the second installment of the Consulting Fee to Ms. Griggs.

82.      Upon information and belief, Ms. Griggs is a visual effects producer in the film industry and has little to no experience in the nursing home industry.

83.      The Consulting Fee was not consideration for her services, but was simply a mechanism to compensate Ms. Griggs for participating in, and causing the Debtor to participate in, the transactions that denuded the Debtor of its assets and left it with all of its liabilities.

84.      Upon information and belief, in May 2016, the Debtor reimbursed, either directly or indirectly, Tunic Capital, Scheiner, Lichtschein, TL Management, Grand Street Nursing, and/or Parkside for both installments of the Consulting Fee.

**f)   Grand Street Nursing Assigns Its Rights Under the OTA to Parkside.**

85.      Upon information and belief, the Debtor was operated profitably and generated positive net revenue as early as the first or second quarter of 2015, although it remained insolvent at that time.

86.      Grand Street Nursing assigned its rights as transferee under the OTA to Parkside by way of an *Assignment and Assumption Agreement* dated March 1, 2016 (the "Assignment and Assumption Agreement").

87.      Notwithstanding the date inserted into the Assignment and Assumption Agreement, upon information and belief, the Assignment and Assumption Agreement was not actually signed until sometime after May 25, 2016.

17

88.     Parkside provided no consideration to Grand Street Nursing in exchange for the assignment of Grand Street Nursing's rights under the OTA.

89.     By way of a *Liability Assignment and Release Agreement*, dated February 29, 2016 (the "Liability Assignment"), between Grand Street Nursing and Parkside, Grand Street Nursing agreed to assume all of the transferee's liabilities under the OTA as such liabilities existed as of March 1, 2016.

90.     Upon information and belief, the Liability Assignment was not executed until after February 29, 2016.

91.     By way of a *Bill of Sale* dated March 1, 2016, signed by Ms. Griggs on behalf of the Debtor (the "Parkside Bill of Sale"), the Debtor purportedly transferred the Debtor's rights, title, and interest in all of its assets to Parkside as the assignee of Grand Street Nursing's rights under the OTA.

92.     Notwithstanding the date inserted into the Parkside Bill of Sale, the Parkside Bill of Sale was not signed or delivered to Parkside until May 23, 2016.

93.     Parkside provided no consideration to the Debtor for the transfer of the Debtor's assets as reflected in the OTA or in the Parkside Bill of Sale.

94.     Grand Street Real Estate, as landlord, and Parkside, as tenant, entered into a lease concerning the Premises dated March 1, 2016 (the "Parkside Lease").

95.     Pursuant to the Parkside Lease, Grand Street Real Estate is entitled to collect $70,000.00 per month (plus 3 percent annual base rent escalations) from Parkside, and Parkside must pay all taxes and insurance concerning the Premises.

**g) The Various Transactions Outlined Above Should Be Collapsed and Viewed as One Transaction.**

96.    None of the aforementioned transactions involving the Debtor or its insiders would have occurred on its own.

97.    Each of the aforementioned transactions involving the Debtor or its insiders was conditioned or dependent upon the other transactions.

98.    Each of the aforementioned transactions involving the Debtor or its insiders was part of an overall scheme to defraud the Debtor and its creditors by depleting the Debtor's assets through an inter-related series of transactions.

**V.    Scheiner and Lichtschein Are Personally Liable.**

99.    Scheiner and Lichtschein personally committed, participated in, or directed the commission of the acts of TL Management, Tunic Capital, CT Finance, Grand Street Nursing, Grand Street Real Estate and Grand Street PL that are alleged herein.

100.    At all times relevant herein, Scheiner and Lichtschein maintained complete domination of the finances, policy, and business practices of TL Management, Tunic Capital, CT Finance, Grand Street Nursing, Grand Street Real Estate and Grand Street PL in all respects, including the transactions that are the subject of this Complaint, such that TL Management, Tunic Capital, CT Finance, Grand Street Nursing, Grand Street Real Estate and Grand Street PL had no separate mind, will, or existence of their own.

101.    Scheiner and Lichtschein maintained and used such control to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or to commit a dishonest or unjust act in contravention of the Debtor's legal rights.

102.    Scheiner's and Lichtschein's aforesaid control over TL Management, Tunic Capital, CT Finance, Grand Street Nursing, Grand Street Real Estate and Grand Street PL

proximately caused the injuries and unjust losses sustained by the Debtor, as alleged in this Complaint.

103.    At all times relevant herein, there was such a unity of interest and ownership between Scheiner, Lichtschein, TL Management, Tunic Capital, CT Finance, Grand Street Nursing, Grand Street Real Estate and Grand Street PL that the independence of those entities had in effect ceased or had never begun.

104.    An adherence to the fiction that TL Management, Tunic Capital, CT Finance, Grand Street Nursing, Grand Street Real Estate and Grand Street PL were entities with an identity separate and apart from Scheiner and Lichtschein would serve only to defeat justice and equity by permitting Scheiner and Lichtschein to escape liability arising out of the operations of TL Management, Tunic Capital, CT Finance, Grand Street Nursing, Grand Street Real Estate and Grand Street PL for the benefit of Scheiner and Lichtschein.

## VI.    The Debtor Was Insolvent at All Times Relevant to This Complaint.

105.    The Debtor was insolvent during all times relevant herein, as evidenced by, *inter alia*, the following:

  a.  A review of the tax returns filed on behalf of WH Holdings, which owns 100% of the stock of the Debtor, reveals that the Debtor had a negative net worth as of December 31, 2012;

  b.  Clark, the temporary administrator appointed by the State of Connecticut, testified at her Rule 2004 examination that soon after she started working at the Debtor in the fall of 2012, she had to negotiate payments with various creditors to ensure that the facility continued to operate and provide services to its patients;

  c.  Tax returns prepared, but not filed, for WH Holdings indicate that the Debtor's net worth had decreased as of December 31, 2013;

  d.  On August 21, 2014, TD Bank filed a foreclosure action against the Debtor, Walnut Hill Real Estate LLC, WH Holdings, Dr. Griggs, and WHMC, Case No. HHB-CV-14-6026483, claiming that payments had not been made on two promissory notes totaling approximately $9,000,000;

e.   Various collection actions were filed in 2013 and 2014 by persons and entities who had provided goods and/or services to the Debtor;

f.   The State of Connecticut issued a tax warrant in the amount of about $124,000.00 for the Debtor's failure to pay withholding taxes from June 30, 2014 to March 31, 2015;

g.   A tax statement for the City of New Britain for three years of delinquent personal property taxes owed by the Debtor indicates that the taxes had not been paid for the years 2011, 2012, and 2013;

h.   A water/sewer lien in the amount of approximately $27,000 was recorded on the City of New Britain land records for 55 Grand Street, New Britain, Connecticut on April 30, 2014; and

i.   Numerous checks issued by the Debtor were returned for insufficient funds between March 2013 and December 2014.

j.   As of February 2015, the Debtor had been sued by multiple vendors and almost every vendor was threatening legal proceedings against the Debtor.

106.   In fact, the Debtor has been in a distressed financial condition since as early as 2012 and continued to have financial difficulties until it filed for Chapter 7 bankruptcy protection.

107.   In short, the Debtor was insolvent and was no longer able to pay its debts as they came due on the dates that each of the subject fraudulent transfers were made.

**COUNT ONE**
**INTENTIONAL FRAUDULENT TRANSFER**
**11 U.S.C. §§ 548(a)(1)(A), 550 AND 551**

108.   The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

109.   Between January 2015 and March 2016 – within two (2) years of the Petition Date – Scheiner, Lichtschein, and/or TL Management orchestrated the series of transactions set forth in the paragraphs above.

110.   These transactions, as a whole, resulted in the following: (a) the Debtor transferred all of its assets to entities controlled by Scheiner, Lichtschein, and/or TL

Management, or those entities' assignees, for no consideration; (b) the Debtor retained all of its liabilities; (c) WH Real Estate transferred ownership of the Premises, which housed the Debtor's operations, to an entity controlled by Scheiner, Lichtschein, and/or TL Management, and stipulated to entry of a summary process judgment against the Debtor; (d) Ms. Griggs, the Debtor's principal, received $175,000.00; and (e) various insiders of the Debtor received releases from millions of dollars of obligations under the Loan Documents, then owned by CT Finance (each individually and collectively, the "Collapsible Fraudulent Transfer").

111.    The Collapsible Fraudulent Transfer was made to or for the benefit of all defendants.

112.    The Collapsible Fraudulent Transfer was made by the Debtor with the actual intent to hinder, delay, and defraud some or all of the Debtor's then existing and future creditors.

113.    The Collapsible Fraudulent Transfer constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and is recoverable from all defendants pursuant to § 550(a) of the Bankruptcy Code.

114.    As a result of the foregoing, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding each aspect of the Collapsible Fraudulent Transfer and preserving the Collapsible Fraudulent Transfer; (b) directing that each component of the Collapsible Fraudulent Transfer be set aside; (c) recovering all assets of the Debtor that were transferred as a component of the Collapsible Fraudulent Transfer, or the value thereof, plus any profits generated therefrom, from any or all of the defendants for the benefit of the Debtor's Estate and its creditors; and (d) an injunction against the defendants prohibiting them from further disposing of the property transferred.

**COUNT TWO**
**CONSTRUCTIVE FRAUDULENT TRANSFER**
**U.S.C. §§ 548(a)(1)(B), 550 AND 551**

115.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

116.    The Collapsible Fraudulent Transfer was made on or within two (2) years of the Petition Date.

117.    The Debtor did not receive reasonably equivalent value in exchange for the Collapsible Fraudulent Transfer.

118.    At the time of the Collapsible Fraudulent Transfer, the Debtor was insolvent, or became insolvent, as a result of the Collapsible Fraudulent Transfer.

119.    At the time of the Collapsible Fraudulent Transfer, the Debtor was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

120.    At the time of the Collapsible Fraudulent Transfer, the Debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

121.    The Collapsible Fraudulent Transfer constitutes a constructively fraudulent transfer avoidable by the Trustee pursuant to §§ 548(a)(1)(B) and 551 of the Bankruptcy Code and are recoverable from the defendants pursuant to § 550(a) of the Bankruptcy Code.

122.    As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding each aspect of the Collapsible Fraudulent Transfer and preserving the Collapsible Fraudulent Transfer; (b) directing that each component of the Collapsible Fraudulent Transfer be set aside; (c) recovering all assets of the Debtor that were transferred as a component of the Collapsible Fraudulent Transfer, or the

value thereof, plus any profits generated therefrom, from any or all of the defendants for the

benefit of the Debtor's Estate and its creditors; and (d) an injunction against the defendants

prohibiting them from further disposing of the property transferred.

## COUNT THREE
### CUFTA INTENTIONAL FRAUDULENT TRANSFER 11 U.S.C. §§ 544(b)(1), 550(a) AND 551 AND CONN. GEN. STAT. §§ 52-552e(a)(1) AND 52-552h(a)

123.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

124.    The Collapsible Fraudulent Transfer was made on or within four (4) years of the

Petition Date.

125.    The Collapsible Fraudulent Transfer was made with the actual intent to hinder,

delay, or defraud some or all of the Debtor's then existing and future creditors.

126.    The Collapsible Fraudulent Transfer constituted a fraudulent transfer within the

meaning of, and in violation of, the Connecticut Uniform Fraudulent Transfer Act ("CUFTA"),

Conn. Gen. Stat. § 52-552e(a)(1).

127.    As a direct and proximate result of the Collapsible Fraudulent Transfer, the

Debtor, its Estate, and its creditors have been caused to suffer money damages.

128.    At all times relevant herein, there have been creditors who have held and still hold

matured or unmatured unsecured claims against the Debtor that were and are allowable under §

502 of the Bankruptcy Code or that were and are not allowable only under § 502(e).

129.    As a result of the foregoing, the Trustee is entitled to a judgment: (a) avoiding

each aspect of the Collapsible Fraudulent Transfer and preserving the Collapsible Fraudulent

Transfer; (b) directing that each component of the Collapsible Fraudulent Transfer be set aside;

(c) recovering all assets of the Debtor that were transferred as a component of the Collapsible

Fraudulent Transfer, or the value thereof, plus any profits generated therefrom, from any or all of

the defendants for the benefit of the Debtor's Estate and its creditors, pursuant to 11 U.S.C. §§ 550 and 551 and Conn. Gen. Stat. § 52-552h(a); and (d) an injunction against the defendants prohibiting them from further disposing of the property transferred.

## COUNT FOUR
## CUFTA CONSTRUCTIVE FRAUDULENT TRANSFER
### CONN. GEN. STAT. §§ 52-552e(a)(2) AND 52-552f(a)

130.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

131.    The Collapsible Fraudulent Transfer was made on or within four (4) years of the Petition Date.

132.    The Debtor did not receive reasonably equivalent value in exchange for the Collapsible Fraudulent Transfer.

133.    At the time of the Collapsible Fraudulent Transfer, the Debtor was insolvent, or became insolvent, as a result of the Collapsible Fraudulent Transfer.

134.    At the time of the Collapsible Fraudulent Transfer, the Debtor was engaged, or was about to engage, in a business or transaction, for which any property remaining with the Debtor was an unreasonably small capital.

135.    At the time of the Collapsible Fraudulent Transfer, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

136.    The Collapsible Fraudulent Transfer constitutes a fraudulent transfer within the meaning of, and in violation of, CUFTA, Conn. Gen. Stat. §§ 52-552e(a)(2) and/or 52-552f(a).

137.    As a direct and proximate result of the Collapsible Fraudulent Transfer, the Debtor, its Estate, and its creditors have been caused to suffer money damages.

138.    As a result of the foregoing, the Trustee is entitled to a judgment: (a) avoiding

each aspect of the Collapsible Fraudulent Transfer and preserving the Collapsible Fraudulent

Transfer; (b) directing that each component of the Collapsible Fraudulent Transfer be set aside;

(c) recovering all assets of the Debtor that were transferred as a component of the Collapsible

Fraudulent Transfer, or the value thereof, plus any profits generated therefrom, from any or all of

the defendants for the benefit of the Debtor's Estate and its creditors, pursuant to 11 U.S.C. §§

550 and 551 and state law); and (d) an injunction against the defendants prohibiting them from

further disposing of the property transferred.

**COUNT FIVE**
**CIVIL CONSPIRACY**
**(SCHEINER, LICHTSCHEIN, CT FINANCE, TL MANAGEMENT,**
**TUNIC CAPITAL, GRAND STREET NURSING, GRAND STREET PL,**
**GRAND STREET REAL ESTATE and MS. GRIGGS)**

139.    Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street

Nursing, Grand Street PL, Grand Street Real Estate, and Ms. Griggs conspired and agreed to

work together to systematically transfer ownership and/or control of the Debtor's assets for no

consideration by way of a series of unlawful acts and/or lawful acts undertaken by unlawful

means.

140.    CT Finance, acting by and through Scheiner and Lichtschein, purchased the Loan

Documents in order to gain leverage to orchestrate the Collapsible Fraudulent Transfer and

deprive the Debtor of all of its assets.

141.    CT Finance offered releases to the Guarantors and WH Real Estate from

multimillion-dollar liabilities on the $8.5 Million Note and the Revolving Credit Note, while at

the same time offering the Debtor's principal the $175,000.00 Consulting Fee, which, upon

information and belief, the Debtor then reimbursed, to induce the Debtor's principal to transfer

26

all of the Debtor's assets to entities owned and controlled by Scheiner and Lichtschein for no consideration.

142.    By virtue of causing, allowing, or inducing the Debtor to transfer all of its assets, and by virtue of causing and/or accepting benefits of the Collapsible Fraudulent Transfer, each of the aforementioned conspirators committed at least one act in furtherance of their conspiracy to systematically siphon the Debtor's assets for the benefit of themselves or a third party.

143.    The Debtor has incurred damages as a result of the civil conspiracy between and among Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street Real Estate, and Ms. Griggs in an amount to be proven at trial.

## COUNT SIX
## INTENTIONAL FRAUDULENT TRANSFER
## 11 U.S.C. §§ 548(a)(1)(A), 550 AND 551
## (ANNEMARIE GRIGGS)

144.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

145.    Upon information and belief, the Debtor paid the first installment of the Consulting Fee or reimbursed, either directly or indirectly, Tunic Capital, Scheiner, Lichtschein, TL Management, Grand Street Nursing, and/or Parkside for the first installment of the Consulting Fee.

146.    Upon information and belief, the Debtor reimbursed, either directly or indirectly, Tunic Capital, Scheiner, Lichtschein, TL Management, Grand Street Nursing, and/or Parkside for the second installment of the Consulting Fee.

147.    The payment of the Consulting Fee was simply a mechanism to compensate Ms. Griggs for participating in, and causing the Debtor to participate in, the series of collapsible transactions that denuded the Debtor of its assets and left it with all of its liabilities.

148.    The payment of the Consulting Fee was not provided as consideration to Ms.

Griggs for consulting services rendered by Ms. Griggs because she did not provide any

consulting services to either Grand Street Nursing or Parkside.

149.    As a result of the transactions described herein, consideration that should have

been paid to the Debtor for the transfer of all of its assets was diverted to Ms. Griggs, the

Debtor's principal.

150.    The payment of the Consulting Fee was a transfer of an interest of the Debtor in

property that was made to or for the benefit of Ms. Griggs.

151.    The payment of the Consulting Fee was made with the actual intent to hinder,

delay, and defraud some or all of the Debtor's then existing and future creditors.

152.    The payment of the Consulting Fee constitutes a fraudulent transfer avoidable by

the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and is recoverable from Ms.

Griggs pursuant to § 550(a) of the Bankruptcy Code.

153.    As a result of the foregoing, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the

Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the payment

of the Consulting Fee; (b) directing that the payment of the Consulting Fee be set aside; (c)

recovering the payment of the Consulting Fee, or the value thereof, from Ms. Griggs for the

benefit of the Debtor's Estate and its creditors; and (d) an injunction against Ms. Griggs

prohibiting her from further disposing of the property transferred.

**COUNT SEVEN**
**CONSTRUCTIVE FRAUDULENT TRANSFER**
**U.S.C. §§ 548(a)(1)(B), 550 AND 551**
**(ANNEMARIE GRIGGS)**

154.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

155.    The Consulting Fee was paid on or within two (2) years of the Petition Date.

156.     The Debtor did not receive reasonably equivalent value in exchange for the Collapsible Fraudulent Transfer that led to the payment of the Consulting Fee, nor for the payment of the Consulting Fee, to Ms. Griggs.

157.     At the time of the payment of the Consulting Fee, the Debtor was insolvent, or became insolvent, as a result of the Collapsible Fraudulent Transfer that resulted in the payment of the Consulting Fee.

158.     At the time of the Collapsible Fraudulent Transfer that resulted in the payment of the Consulting Fee, the Debtor was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

159.     At the time of the Collapsible Fraudulent Transfer that resulted in the payment of the Consulting Fee, the Debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

160.     The payment of the Consulting Fee constitutes a constructively fraudulent transfer avoidable by the Trustee pursuant to §§ 548(a)(1)(B) and 551 of the Bankruptcy Code and is recoverable from Ms. Griggs pursuant to § 550(a) of the Bankruptcy Code.

161.     As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the payment of the Consulting Fee; (b) directing that the payment of the Consulting Fee be set aside; (c) recovering the payment of the Consulting Fee, or the value thereof, from Ms. Griggs for the benefit of the Debtor's Estate; and (d) an injunction against Ms. Griggs prohibiting her from further disposing of the property transferred.

29

## COUNT EIGHT
### CUFTA INTENTIONAL FRAUDULENT TRANSFER
### 11 U.S.C. §§ 544(b)(1), 550(a) AND 551 AND
### CONN. GEN. STAT. §§ 52-552e(a)(1) AND 52-552h(a)
### (ANNEMARIE GRIGGS)

162.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

163.    The payment of the Consulting Fee was made on or within four (4) years of the Petition Date.

164.    The payment of the Consulting Fee was made with the actual intent to hinder, delay, or defraud some or all of the Debtor's then existing and future creditors.

165.    The payment of the Consulting Fee constituted a fraudulent transfer within the meaning of, and in violation of, CUFTA, Conn. Gen. Stat. § 52-552e(a)(1).

166.    As a direct and proximate result of the payment of the Consulting Fee, the Debtor, its Estate, and its creditors have been caused to suffer money damages.

167.    At all times relevant herein, there have been creditors who have held and still hold matured or unmatured unsecured claims against the Debtor that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e).

168.    As a result of the foregoing, the Trustee is entitled to a judgment: (a) avoiding and preserving the payment of the Consulting Fee; (b) directing that the payment of the Consulting Fee be set aside; (c) recovering the payment of the Consulting Fee, or the value thereof, pursuant to 11 U.S.C. §§ 550 and 551 and Conn. Gen. Stat. § 52-552h(a), from Ms. Griggs for the benefit of the Debtor's Estate; and (d) an injunction against Ms. Griggs prohibiting her from further disposing of the transferred property.

## COUNT NINE
## CUFTA CONSTRUCTIVE FRAUDULENT TRANSFER
## CONN. GEN. STAT. §§ 52-552e(a)(2) AND 52-552f(a)
## (ANNEMARIE GRIGGS)

169.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

170.    The payment of the Consulting Fee was made on or within four (4) years of the Petition Date.

171.    The Debtor did not receive reasonably equivalent value in exchange for the series of the Collapsible Fraudulent Transfer that led to the payment of the Consulting Fee, nor for the payment of the Consulting Fee, to Ms. Griggs.

172.    At the time of the payment of the Consulting Fee, the Debtor was insolvent, or became insolvent, as a result of the Collapsible Fraudulent Transfer that resulted in the payment of the Consulting Fee.

173.    At the time of the Collapsible Fraudulent Transfer that resulted in the payment of the Consulting Fee, the Debtor was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

174.    At the time of the Collapsible Fraudulent Transfer that resulted in the payment of the Consulting Fee, the Debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured

175.    The payment of the Consulting Fee constitutes a fraudulent transfer within the meaning of, and in violation of, CUFTA, Conn. Gen. Stat. §§ 52-552e(a)(2) and/or 52-552f(a).

176.    As a direct and proximate result of the payment of the Consulting Fee, the Debtor, its Estate, and its creditors have been caused to suffer money damages.

31

177.    As a result of the foregoing, the Trustee is entitled to a judgment: (a) avoiding and preserving the payment of the Consulting Fee; (b) directing that the payment of the Consulting Fee be set aside; (c) recovering the payment of the Consulting Fee, or the value of thereof, from Ms. Griggs for the benefit of the Debtor's Estate pursuant to 11 U.S.C. §§ 550 and 551 and state law; and (d) an injunction against Ms. Griggs prohibiting her from further disposing of the property transferred.

**COUNT TEN**
**BREACH OF FIDUCIARY DUTY**
**<u>(ANNEMARIE GRIGGS)</u>**

178.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

179.    As an officer and principal of the Debtor, Ms. Griggs had fiduciary duties to the Debtor to act with the utmost good faith, fair dealing, care, and loyalty to the Debtor.

180.    Ms. Griggs breached her fiduciary duties to the Debtor by: (a) participating in and facilitating the Collapsible Fraudulent Transfer; (b) allowing the transfer of all of the Debtor's assets for no consideration, while the Debtor retained all of its liabilities, leaving its creditors unpaid; (c) entering into the Consulting Agreement; (d) taking the Consulting Fee for her own personal benefit at the expense of the Debtor; and (e) procuring the release of the Guarantors, of whose estates Ms. Griggs and/or her family were beneficiaries.

181.    Negotiating for and accepting the Consulting Fee by Ms. Griggs was an act of self-dealing because the Consulting Fee was not consideration for her consulting services, but simply a mechanism to compensate Ms. Griggs for participating in the transactions that denuded the Debtor of its assets and left it with all of its liabilities.

182.    As a result of the foregoing, the Debtor has incurred damages.

32

## COUNT ELEVEN
## INTENTIONAL FRAUDULENT TRANSFER
## 11 U.S.C. §§ 548(a)(1)(A), 550 AND 551
## (PARKSIDE)

183.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

184.    On or within ninety (90) days before the Petition Date, the Debtor made transfers

of its property to or for the benefit of Parkside, including, but not limited to, the following:

|   | Transfer Date | Amount of Transfer from the Debtor |
|---|---|---|
| 1 | 03/30/16 | $ 969.95 |
| 2 | 04/13/16 | $ 713.95 |
| 3 | 04/15/16 | $ 541,119.98 |
| 4 | 05/04/16 | $ 175,000.00 |
| 5 | 05/12/16 | $ 433,475.79 |
| 6 | 05/27/16 | $ 175,750.42 |
| | TOTAL: | $ 1,327,030.09 |

(collectively, the "90-Day Transfers").

185.    The 90-Day Transfers were made on or within two (2) years of the Petition Date.

186.    The 90-Day Transfers were made to or for the benefit of Parkside.

187.    The 90-Day Transfers were made with the actual intent to hinder, delay, or

defraud some or all of the Debtor's then existing and future creditors.

188.    The 90-Day Transfers constitute fraudulent transfers avoidable by the Trustee

pursuant to § 548(a)(1)(A) of the Bankruptcy Code and are recoverable from Parkside pursuant

to § 550(a) of the Bankruptcy Code.

189.    As a result of the foregoing, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the

Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the 90-Day

Transfers; (b) directing that the 90-Day Transfers be set aside; (c) recovering the 90-Day

Transfers, or the value thereof, from Parkside for the benefit of the Debtor's Estate; and (d) an

injunction against Parkside prohibiting it from further disposing of the property transferred.

### COUNT TWELVE
### CONSTRUCTIVE FRAUDULENT TRANSFER
### U.S.C. §§ 548(a)(1)(B), 550 AND 551
### (PARKSIDE)

190.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

191.    The 90-Day Transfers were made on or within two (2) years of the Petition Date.

192.    The Debtor did not receive reasonably equivalent value in exchange for the 90-

Day Transfers.

193.    At the time of the 90-Day Transfers, the Debtor was insolvent, or became

insolvent, as a result of the 90-Day Transfers.

194.    At the time of the 90-Day Transfers, the Debtor was engaged in a business or a

transaction, or was about to engage in a business or a transaction, for which any property

remaining with the Debtor was an unreasonably small capital.

195.    At the time of the 90-Day Transfers, the Debtor intended to incur, or believed that

it would incur, debts that would be beyond its ability to pay as such debts matured.

196.    Unless the Collapsible Fraudulent Transfer is avoided, then the 90-Day Transfers

constitute constructively fraudulent transfers avoidable by the Trustee pursuant to §§

548(a)(1)(B) and 551 of the Bankruptcy Code and are recoverable from Parkside pursuant to §

550(a) of the Bankruptcy Code.

197.    As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the

Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving 90-Day

Transfers; (b) directing that the 90-Day Transfers be set aside; (c) recovering the 90-Day

Transfers, or the value thereof, from Parkside for the benefit of the Debtor's Estate; and (d) an

injunction against Parkside prohibiting it from further disposing of the property transferred.

**COUNT THIRTEEN**
**CUFTA INTENTIONAL FRAUDULENT TRANSFER**
**11 U.S.C. §§ 544(b)(1), 550(a) AND 551 AND**
**CONN. GEN. STAT. §§ 52-552e(a)(1) AND 52-552h(a)**
**(PARKSIDE)**

198.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

199.    The 90-Day Transfers were made on or within four (4) years of the Petition Date.

200.    The 90-Day Transfers were made with the actual intent to hinder, delay, or

defraud some or all of the Debtor's then existing and future creditors.

201.    The 90-Day Transfers constituted fraudulent transfers within the meaning of, and

in violation of, CUFTA, Conn. Gen. Stat. § 52-552e(a)(1).

202.    As a direct and proximate result of the 90-Day Transfers, the Debtor, its Estate,

and its creditors have been caused to suffer money damages.

203.    At all times relevant herein, there have been creditors who have held and still hold

matured or unmatured unsecured claims against the Debtor that were and are allowable under §

502 of the Bankruptcy Code or that were and are not allowable only under § 502(e).

204.    As a result of the foregoing, the Trustee is entitled to a judgment: (a) avoiding and

preserving the 90-Day Transfers; (b) directing that the 90-Day Transfers be set aside; (c)

recovering the 90-Day Transfers, or the value thereof, pursuant to 11 U.S.C. §§ 550 and 551 and

Conn. Gen. Stat. § 52-552h(a), from Parkside for the benefit of the Debtor's Estate; and (d) an

injunction against Parkside prohibiting it from further disposing of the transferred property.

## COUNT FOURTEEN
## CUFTA CONSTRUCTIVE FRAUDULENT TRANSFER
## CONN. GEN. STAT. §§ 52-552e(a)(2) AND 52-552f(a)
## (PARKSIDE)

205.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

206.    The 90-Day Transfers were made on or within four (4) years of the Petition Date.

207.    The Debtor did not receive reasonably equivalent value in exchange for the 90-Day Transfers.

208.    At the time of the 90-Day Transfers, the Debtor was insolvent, or became insolvent, as a result of the 90-Day Transfers.

209.    At the time of the 90-Day Transfers, the Debtor was engaged, or was about to engage, in a business or transaction, for which any property remaining with the Debtor was an unreasonably small capital.

210.    At the time of the 90-Day Transfers, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

211.    The 90-Day Transfers constitute fraudulent transfers within the meaning of, and in violation of, CUFTA, Conn. Gen. Stat. §§ 52-552e(a)(2) and/or 52-552f(a).

212.    As a direct and proximate result of the 90-Day Transfers, the Debtor, its Estate, and its creditors have been caused to suffer money damages.

213.    As a result of the foregoing, the Trustee is entitled to a judgment: (a) avoiding and preserving the 90-Day Transfers; (b) directing that the 90-Day Transfers be set aside; (c) recovering the 90-Day Transfers, or the value of thereof, from Parkside for the benefit of the Debtor's Estate pursuant to 11 U.S.C. §§ 550 and 551 and state law; and (d) an injunction against Parkside prohibiting it from further disposing of the property transferred.

## COUNT FIFTEEN
## PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 547, 550 AND 551
## (PARKSIDE)

214.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

215.    The 90-Day Transfers were made on or within ninety (90) days of the Petition Date.

216.    The 90-Day Transfers constitute transfers of the Debtor's interest in property.

217.    The 90-Day Transfers were for, or on account of, an antecedent debt(s) owed by the Debtor before such transfer(s) were made.

218.    The Debtor made the 90-Day Transfers while it was insolvent.

219.    The 90-Day Transfers enabled Parkside to receive more than it would have received if: (a) the Debtor's case was a case under Chapter 7 of the Bankruptcy Code; (b) the 90-Day Transfers had not been made; and (c) Parkside had received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

220.    Pursuant to § 547 of the Bankruptcy Code, the Trustee is entitled to avoid the Parkside 90-Day Transfers and to recover from Parkside the 90-Day Transfers, or the value thereof, plus interest thereon, for the benefit of the Debtor's Estate pursuant to 11 U.S.C. §§ 550 and 551.

## COUNT SIXTEEN
## RECOVERY OF AVOIDED TRANSFERS – 11 U.S.C. § 550
## (PARKSIDE)

221.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

222.    The Trustee is entitled to avoid the 90-Day Transfers pursuant to 11 U.S.C. § 547(b).

223.     Parkside was the initial transferee of the 90-Day Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit all avoided transfer(s) were made.

224.     Pursuant to 11 U.S.C. § 550(a), the Trustee is entitled to recover from Parkside the 90-Day Transfers, or the value thereof, plus interest thereon and costs.

## COUNT SEVENTEEN
## CONSTRUCTIVE TRUST
## (PARKSIDE and GRAND STREET PL)

225.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

226.     Parkside and Grand Street PL obtained and hold legal title to the Debtor's assets by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by another form of unconscionable conduct, artifice, concealment, or questionable means.

227.     Parkside and Grand Street PL ought not, in equity and good conscience, hold and enjoy legal title assets of the Debtor, to the detriment of the Debtor, its estate and its creditors.

## COUNT EIGHTEEN
## CONNECTICUT UNFAIR TRADE PRACTICES ACT
## VIOLATION OF CONN. GEN. STAT. § 42-110b(a)
## (SCHEINER, LICHTSCHEIN, CT FINANCE, TL MANAGEMENT,
## TUNIC CAPITAL, GRAND STREET NURSING, GRAND STREET PL,
## GRAND STREET REAL ESTATE and PARKSIDE)

228.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

229.     Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street Real Estate and Parkside have engaged in a pattern of unfair and deceptive practices calculated to siphon the Debtor's assets for their benefit.

230.     The acts and practices alleged in this count constituted unfair and deceptive acts and practices in violation of Conn. Gen. Stat. § 42-110b(a) of the Connecticut Unfair Trade Practices Act ("CUTPA").

231.   The acts and practices alleged herein were unfair in that (a) they offended public policy as it has been established by the common law or otherwise or were within at least the penumbra of some common law or established concept of unfairness, (b) were immoral, unethical, oppressive or unscrupulous, or (c) caused substantial injury to the Debtor in that the injuries that they caused were substantial, were not outweighed by any countervailing benefits to consumers or competition that they produced, and caused an injury that the Debtor, itself, could not reasonably have avoided.

232.   The acts and practices alleged in this Count were done in the conduct of the primary trade or business of Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street Real Estate and Parkside.

233.   The unfair and deceptive acts and practices of Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street Real Estate and Parkside have caused the Debtor to suffer an ascertainable loss of money or property and actual damages and have forced the Debtor and its Estate to expend significant time, legal fees, and other resources.

234.   The acts and practices of Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street Real Estate and Parkside alleged in this Count were done with a reckless indifference to the Debtor's rights or were intentional and wanton violations of those rights.

## COUNT NINETEEN
## UNJUST ENRICHMENT
## (SCHEINER, LICHTSCHEIN, CT FINANCE, TL MANAGEMENT,
## TUNIC CAPITAL, GRAND STREET NURSING,
## GRAND STREET PL, and GRAND STREET REAL ESTATE)

235.   The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

236.    Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, and Grand Street Real Estate received a substantial financial benefit from the Collapsible Fraudulent Transfers and the 90-day Transfers for which they unjustly did not pay or render services or otherwise provide consideration to the Debtor to justify such transfers.

237.    Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, and Grand Street Real Estate did not pay or otherwise provide consideration to the Debtor for the benefit conferred upon them by the Collapsible Fraudulent Transfers and the 90-day Transfers.

238.    The failure of Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, and Grand Street Real Estate to pay or otherwise provide consideration to the Debtor for the Collapsible Fraudulent Transfers and the 90-day Transfers and for the benefits conferred upon them was to the detriment of the Debtor, its Estate, and its creditors.

239.    It is contrary to equity and good conscience for Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, and Grand Street Real Estate to retain such benefits.

240.    As a result of the foregoing, the Debtor, its estate, and its creditors have been injured.

## COUNT TWENTY
## UNJUST ENRICHMENT
## (PARKSIDE)

241.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

242.    Parkside received a substantial financial benefit from the Collapsible Fraudulent Transfers and the 90-day Transfers for which it unjustly did not pay or render services or otherwise provide consideration to the Debtor to justify such transfers.

243.    Parkside did not pay or otherwise provide consideration to the Debtor for the benefit conferred upon it by the Collapsible Fraudulent Transfers and the 90-day Transfers.

244.    The failure of Parkside to pay or otherwise provide consideration to the Debtor for the Collapsible Fraudulent Transfers and the 90-day Transfers and for the benefits conferred upon Parkside was to the detriment of the Debtor, its Estate, and its creditors.

245.    It is contrary to equity and good conscience for Parkside to retain such benefits.

246.    As a result of the foregoing, the Debtor, its estate, and its creditors have been injured.

**COUNT TWENTY-ONE
UNJUST ENRICHMENT
(ANNEMARIE GRIGGS)**

247.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

248.    Ms. Griggs received a substantial financial benefit from the Collapsible Fraudulent Transfers and the Consulting Fee.

249.    Ms. Griggs did not pay or otherwise provide consideration to the Debtor for the benefit conferred upon her by the Collapsible Fraudulent Transfers and the Consulting Fee.

250.    The failure of Ms. Griggs to pay or otherwise provide consideration to the Debtor for the Collapsible Fraudulent Transfers and the Consulting Fee and the benefits conferred upon her was to the detriment of the Debtor, its Estate, and its creditors.

251.    It is contrary to equity and good conscience for Ms. Griggs to retain such benefits.

252.     As a result of the foregoing, the Debtor, its estate, and its creditors have been injured.

## COUNT TWENTY-TWO
## DECLARATORY JUDGMENT
## FED. R. BANKR. P. 7001(9)
## (PARKSIDE)

253.     The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

254.     Prior to the Petition Date, the Debtor paid insurance premiums to various entities.

255.     Starting in February 2016, checks have been issued to the Debtor for, *inter alia*, refunds of overpayments of worker's compensation premiums and an insurance payment on a claim for fence damage (collectively, the "Insurance Refunds and Payments").

256.     The Trustee is in possession of the Insurance Refunds and Payments.

257.     The Insurance Refunds and Payments constitute property of the Debtor's estate within the meaning of § 541 of the Bankruptcy Code because the Debtor paid the insurance and/or worker's compensation premiums prior to the Petition Date and is entitled to any refunds or insurance claim payments from those insurance premiums.

258.     Parkside claims that the Insurance Refunds and Payments belong to Parkside because Parkside is the successor operator of the former Debtor's nursing home.

259.     Parkside does not have the legal right to the receipt of the Insurance Refunds and Payments.

260.     Pursuant to Fed. R. Bankr. R. 7001(19), the Trustee seeks a declaratory judgment determining that the Insurance Refunds and Payments in the Trustee's possession are property of the Debtor's Estate and, therefore, the Trustee has the legal right and title to hold the Insurance Refunds and Payments for the benefit of the Estate's creditors.

### COUNT TWENTY-THREE
### DISALLOWANCE OF ALL CLAIMS
### 11 U.S.C. § 502(d) AND (j)
### (PARKSIDE)

261.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

262.    Parkside is an entity from which property is recoverable under 11 U.S.C. § 550.

263.    Parkside obtained and holds legal title to Debtor's assets by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by another form of unconscionable conduct, artifice, concealment, or questionable means.

264.    Parkside is a transferee of the transfer(s) avoidable under 11 U.S.C. § 547.

265.    Parkside is a transferee of the transfer(s) avoidable under 11 U.S.C. § 548 and/or applicable state fraudulent transfer law.

266.    Parkside has not paid the amount of the transfer(s), or turned over such property, for which Parkside is liable under 11 U.S.C. § 550.

267.    Pursuant to 11 U.S.C. § 502(d), any and all claims of Parkside and/or its assignee against the Debtor or Estate must be disallowed until such time as Parkside: (i) transfers to Trustee all assets of the Debtor that were transferred as a component of the Collapsible Fraudulent Transfer, or the value thereof, plus any profits generated therefrom, and (ii) pays to the Trustee an amount equal to the aggregate amount of the 90-Day Transfers, plus interest thereon and costs.

### COUNT TWENTY-FOUR
### DISALLOWANCE OF ALL CLAIMS
### 11 U.S.C. § 502(d) AND (j)
### SCHEINER, LICHTSCHEIN, CT FINANCE, TL MANAGEMENT,
### TUNIC CAPITAL, GRAND STREET NURSING, GRAND STREET PL,
### GRAND STREET REAL ESTATE, and MS. GRIGGS)

268.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

43

269.   Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street Real Estate, and Ms. Griggs and are persons or entities from whom property is recoverable under 11 U.S.C. § 550.

270.   Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street Real Estate, and Ms. Griggs obtained legal title to, or obtained the contractual right to acquire and transfer legal title to, the Debtor's assets by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by another form of unconscionable conduct, artifice, concealment, or questionable means.

271.   Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street Real Estate, and Ms. Griggs are transferees or beneficiaries of transfer(s) avoidable under 11 U.S.C. § 547.

272.   Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street Real Estate, and Ms. Griggs are transferees or beneficiaries of transfer(s) avoidable under 11 U.S.C. § 548 and/or applicable state fraudulent transfer law.

273.   Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street Real Estate, and Ms. Griggs have not paid the value of all assets of the Debtor that were transferred as a component of the Collapsible Fraudulent Transfer, or the value thereof, plus any profits generated therefrom, or the aggregate amount of the 90-Day Transfers that resulted from the Collapsible Fraudulent Transfer for which all of the aforementioned persons or entities are liable under 11 U.S.C. § 550.

274.   Pursuant to 11 U.S.C. § 502(d), any and all claims of Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand Street Nursing, Grand Street PL, Grand Street

Real Estate, Ms. Griggs and/or their assignee against the Debtor or its Estate must be disallowed

until such time as Scheiner, Lichtschein, CT Finance, TL Management, Tunic Capital, Grand

Street Nursing, Grand Street PL, Grand Street Real Estate, and/or Ms. Griggs pays to the Trustee

an amount equal to:  (i) the value of all assets of the Debtor that were transferred as a component

of the Collapsible Fraudulent Transfer, or the value thereof, plus any profits generated therefrom,

plus (ii) the aggregate amount of the 90-Day Transfers, plus interest thereon and costs.


**STATEMENT CONCERNING ENTRY OF FINAL ORDERS OR JUDGMENT**

Pursuant to Fed. R. Bankr. P. 7008, Bonnie Mangan, Chapter 7 Trustee of Walnut Nut

Hill, Inc. hereby consents to entry of final orders or judgment by the Bankruptcy Court.


**WHEREFORE**, the Trustee, Bonnie C. Mangan, respectfully requests that the Court

enter judgment in favor of the Trustee and against the defendants as follows:

1.      Pursuant to 11 U.S.C. §§ 547, 548(a)(1)(A), 548(a)(1)(B), 550(a), 551 and

CUFTA: (a) avoidance of all transfers set forth above; (b) an order directing that

the transfers set forth above be set aside; and (c) recovery of the transfers set forth

above, or the value thereof, from the defendants for the benefit of the Estate of the

Debtor;

2.      As to Count EIGHTEEN, only:

a.   a judgment against each defendant pursuant to Conn. Gen. Stat. § 42-

110g(a) for the actual damages suffered by the Debtor;

b.   punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a); and

    c.  the costs of this suit, including reasonable attorneys' fees, expenses, and interest pursuant to Conn. Gen. Stat. § 42-110g(a).

3.    A permanent injunction precluding the defendants from transferring or disposing of any assets during the pendency of this bankruptcy case;

4.    Disallowance of any claims held by the defendants and/or their assignees against the Debtor and/or the Estate until the defendants and/or their assignees satisfy the judgment;

5.    Money damages;

6.    The imposition of a constructive trust over the assets of the Debtor that were transferred to Parkside;

7.    A declaratory judgment determining that the Insurance Refunds and Payments in the Trustee's possession are property of the Debtor's Estate;

8.    Attorneys' fees;

9.    Pre-judgment interest and costs; and

10.    Such other and further relief as this Court deems just and equitable.

Dated at Milford, Connecticut on this 14th day of June, 2018.

BONNIE C. MANGAN,
CHAPTER 7 TRUSTEE OF
WALNUT HILL, INC.


By: */s/ Lawrence S. Grossman*
    Lawrence S. Grossman, Esq. [ct15790]
    David C. Shufrin, Esq. [ct29230]
    Joanna M. Kornafel, Esq. [ct29199]
    HURWITZ, SAGARIN, SLOSSBERG
     & KNUFF, LLC
    147 North Broad Street
    Milford, CT 06460
    Tel: 203-877-8000/Fax: 203-878-9800
    LGrossman@hssklaw.com
    DShufrin@hssklaw.com
    JKornafel@hssklaw.com